UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS J. GLARNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11CV1802 TIA |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. § 1383(c)(3) for judicial review of the denial

of Plaintiff's application for Supplemental Security Income benefits under Title XVI of the Social

Security Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. §

636(c).

## I. Procedural History

On January 14, 2008, Plaintiff protectively filed an application for Supplemental Security

Income Benefits, alleging that his disability began on November 1, 2007. (Tr. 12, 159-61) In a

statement dated May 27, 2010, Plaintiff amended the alleged onset date to January 14, 2008. (Tr.

183) Plaintiff alleged that he was disabled due to mental conditions, back and knee problems,

alcohol and drug abuse, depression, and anxiety. (Tr. 60) The application was denied on September

4, 2008, after which Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr.

60-68) On October 28, 2010, Plaintiff testified at a hearing before the ALJ. (Tr. 23-52) In a

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the Defendant in this action.

decision dated March 21, 2011, the ALJ found that Plaintiff had not been under a disability since January 14, 2008, the date he filed his application. (Tr. 12-22) The Appeals Council denied Plaintiff's request for review on August 26, 2011. (Tr. 1-3) Thus, the decision of the Appeals Council stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. The ALJ first asked counsel some preliminary questions about prior involuntary hospitalization and narcotic pain medication. Counsel informed the ALJ that Plaintiff had not been involuntarily hospitalized, and he was no longer taking narcotic pain medication. Counsel also reported that Plaintiff continued to go to BJC Behavioral Health since July 2010 and added more medication to his regimen. (Tr. 25-27)

Plaintiff also testified at the hearing. Upon questioning by the ALJ, Plaintiff stated that he lived in a condominium by himself. He had a 12th grade education and vocational training as a painter. Plaintiff had been self-employed from 1993 or 1994 until late 2007 or early 2008. He performed jobs such as carpentry, rough framing, drywall, plaster, painting, and finish work. However, he was not a licensed contractor. Plaintiff received unemployment benefits for about two weeks in 1983 or 1984. He had never received workers compensation. In addition, Plaintiff testified that he had not been in prison but had been jailed about 6 times for traffic violations and DWIs. Plaintiff's most recent DWI arrest was about 5 or 6 years ago. He had been through detoxification and rehabilitation about five times. The last time was in 2005 or 2006 at Bridgeway in St. Charles, Missouri. Plaintiff stated that he last drank alcohol four months ago and last used illegal drugs about 1 ½ years ago, sometime in 2009. Plaintiff further testified that he no longer used illegal drugs and

that his last drug was marijuana. Plaintiff stated that he was honest with his psychiatrist, psychologist, and mental health personnel regarding his alcohol and drug use. (Tr.28-33)

Plaintiff also claimed physical impairments which included hypertension and back pain, which plaintiff attributed to arthritis. However, Plaintiff did not have a diagnosis for the cause of his back pain. Plaintiff took medication to lower his blood pressure, but he had only been on the medicine for one month. His new primary care physician prescribed the medication. Plaintiff's alleged mental impairments were bipolar disorder and major depressive disorder. His previous primary care physician was Dr. Jamry. (Tr. 33-34)

Plaintiff's attorney also questioned him regarding his alleged impairments. Plaintiff testified that his psychiatrist was Dr. Wu at BJC Behavioral Health. He had seen Dr. Wu about once a month over the past two years. However, Plaintiff acknowledged that he "had words" with Dr. Wu because he did not want to take his medication. He indicated that many times over the years he stopped taking his medication out of frustration but that he was still seeing Dr. Wu. Plaintiff had been taking his meds consistently over the past six weeks. In addition, he stated that he was honest with Dr. Wu about everything, including his drinking. (Tr. 34-37)

With regard to activities of daily living, Plaintiff testified that he woke up around 7:00 a.m. or earlier, made coffee, took care of his cat, and read the newspaper. His concentration and memory had worsened over the years, but he had problems concentrating since grade school. Plaintiff also watched TV. Over the past two weeks, he helped his little sister complete a "honey-do" list around her house. He hired someone to do the electric, plumbing, and tile work. However, he was able to work three or four days a week. He was at his sister's house for about eight hours but stated he only worked four to five hours due to problems with his back and knees. Over the past couple years,

Plaintiff became very isolated and did not leave the house very much. However, his parents, family members, and friends visited him once a week to take him to the grocery store. Plaintiff stated he would prefer not to be at the store because of anxiety about being out in public. Although he had not experienced anxiety attacks at the grocery store, Plaintiff testified that he was a "bad case" and could not take the good stuff like Xanax because of his drinking and drug history. (Tr. 37-40)

Plaintiff was able to take care of cleaning around the house. He had no difficulty showering or caring for personal hygiene. On days when he doesn't feel like it, however, he does not attend to personal grooming. The longest time without a shower was about one week. He would get out of bed and to the couch but did not have the energy to shower. Over the past ten years, Plaintiff went months at a time without seeing or talking to people. Plaintiff reiterated that he had been back on his medication for six weeks after going off them for six weeks. However, the ALJ noted a medical record from Plaintiff's case manager which indicated that Plaintiff had been non-compliant with medications from January 2008 to February 1, 2010. Plaintiff stated that the notation made no sense and was wrong. He acknowledged a history of medication not working, which resulted in non-compliance. The ALJ planned to wait for additional medical records before rendering a decision. (Tr. 40-43)

In a post-hearing addendum, the ALJ noted Plaintiff's long history of alcohol and drug abuse, beginning at age 14. Plaintiff relapsed after his most recent admission to Bridgeway in 2007 or 2008. Plaintiff last used cocaine in January or February of 2009 and smoked 1 ½ packs of cigarettes daily. He could shop and cook for himself and ate three meals a day. In addition, he could manage his household and do every day chores. The ALJ further noted that within two to three weeks of recently resuming his medications, Plaintiff began doing repair work at his sister's house, which

indicated that Plaintiff was capable of working when compliant with medication. However, his medical records demonstrated non-compliance. The ALJ also stated that Plaintiff's previous arrests and subsequent jail time stemmed from not only traffic tickets, but also assaulting his son's mother and driving under the influence. Plaintiff also worked as a truck driver, in warehouses, and as a painter, contractor, and carpenter over the past 15 years. (Tr. 44-45)

Further, in February 2010, Plaintiff reported his leisure activities as camping and fishing. The ALJ noted that Plaintiff's appearance was fit and tan, as if he had been performing work or leisurely activities outdoors. The ALJ reiterated Plaintiff's non-compliance with treatment and medication, noting that the record did not indicate that Plaintiff was honest with Dr. Wu. The records from Plaintiff's case manager were more up-to-date with regard to Plaintiff's alcohol and drug use. The ALJ noted again that Plaintiff's case manager stated that Plaintiff had not taken his medication since January 1, 2008 and had a history of non-compliance. The ALJ found that Plaintiff was not credible at all. (Tr. 45-46)

Delores Gonzales, a vocational expert ("VE") submitted interrogatories regarding Plaintiff's ability to work. The VE first assumed a person Plaintiff's age at the date of onset, which was 44, education of 12 plus years; and same past relevant work, who could lift/carry 50 pounds occasionally and 25 pounds frequently, stand/walk 6 hours out of 8, and sit 2 hours out of 8. The person had mild limitations maintaining social function and moderate limitations in concentration, persistence, and pace. He could understand, remember, and carry out at least simple instructions and non-detailed tasks; take appropriate precautions to avoid hazards; and perform repetitive work according to set procedures, sequence, or pace. Given this hypothetical, Plaintiff could not perform any past relevant

work.  However, he could perform other work such as steam cleaner, laborer boot and shoe, and saw operator.  (Tr. 257-58)

For the second hypothetical, the ALJ changed the lifting/carrying requirement to 20 pounds occasionally and 10 pounds frequently.  In addition, he could adapt to routine/simple work changes but not perform repetitive work.  Although Plaintiff could not perform his past relevant work, he could work as a folder, assembler II, and cashier II.  (Tr. 259-60)  Finally, for the third hypothetical, the ALJ changed the lifting requirement to heavy, which was 100 pounds occasionally and 50 pounds frequently.  The individual could understand, remember, and carry out at least simple instructions and non-detailed tasks; perform repetitive work according to set procedures, sequence, or pace; and maintain regular attendance and work presence without special supervision.  The VE opined that Plaintiff could work as a farm worker, laborer in landscape, and hand bander.  (Tr. 261-62)

In a Disability Report – Adult, Plaintiff stated that he could not work because he had pain from knee and back condition which caused problems standing, lifting, and carrying.  In addition, he could not remember anything, and he could not concentrate or follow instructions.  He was also depressed a lot.  (Tr. 188-89)

In a Missouri Supplemental Questionnaire, Plaintiff stated that he suffered from bipolar, depression, anxiety, alcoholism, and physical problems with his back, shoulders, elbows, and knees.  Depression and anxiety mainly kept him from working. Plaintiff was able to take care of his finances and perform household chores and yard work, as well as run errands.  He shopped once a week for about 10 to 20 minutes at a time.  He prepared sandwiches, burgers, eggs, and pasta for meals.  He reported always having problems with sleep, which worsened in November 2007 after he quit drinking and taking meds.  On an average day, Plaintiff watched TV, played with his cat, read, and

ate. He had difficulty following written or verbal instructions because his memory was poor. However, he did not need reminders to complete chores, and he had no problems getting along with others. (Tr. 204-11)

Plaintiff's sister, Sue Glarner, completed a Function Report Adult – Third Party, indicating that she saw Plaintiff weekly. She took him to the grocery store and visited with him. Plaintiff spent the day watching TV and rarely visited with friends or family. He did not sleep at night, so he napped during the day. He wore sweats or ripped clothes and did not shave very often. He was in desperate need of a dentist. Ms. Glarner noted that Plaintiff had taken himself off his medications because they were too difficult to manage. Plaintiff had little motivation to cook much. He did laundry and vacuumed occasionally but was unable to do repairs. He rarely went outside because he did not like talking to people. He grocery shopped once a week for about 40 minutes at a time. He used to be athletic but had no motivation and experienced shoulder, arm, and back problems. Plaintiff no longer went to weekly AA meetings. He had problems getting along with others because he was irritable and wanted to be alone. Ms. Glarner opined that his conditions affected his ability to lift, stair climb, squat, kneel, bend, follow instructions, reach, complete tasks, get along with others, remember, and concentrate. He could walk ½ mile before needing to rest for five minutes. He did not handle stress well and would become angry and break or hit things. (Tr. 213-21)

Plaintiff listed his prescribed medications as Lithium Carbonate, Seroquel, Effexor, Hydrocodone, and Metoprolol. (Tr. 236) Plaintiff also listed Abilify, Simvastatin, Lisinopril, Risperidone, Benztropine, Carbamazepine, Geodon, and Lexapro. (Tr. 243, 245, 249)

### III.  Medical Evidence

When Plaintiff was 16 years old, he was admitted to St. John's Mercy Medical Center for drug dependence and alcoholism.  (Tr. 477-79)  On February 17, 2004, he was admitted to DePaul Health Center for depression.  Imran Chishti, M.D., assessed major depression, recurrent episode, without psychotic features; alcohol abuse, episodic; polysubstance abuse by history; multiple psychosocial stressors; and a Global Assessment Functioning ("GAF") of 30.[2]

Plaintiff received alcohol treatment at Bridgeway Behavior Health from February 6, 2006 through June 24, 2006.  (Tr. 280-88)  In addition, Plaintiff received outpatient services through St. Louis University Hospital between July 31, 2006 and January 17, 2008.  (Tr. 456-70)  Plaintiff's initial diagnosis was depression not otherwise specified; rule out dysthymia; rule out major depressive disorder; rule out bipolar affective disorder; substance abuse/dependence (alcohol) in remission for 3 weeks.  (Tr. 469-70)  Plaintiff was placed on medications and returned primarily for prescription refills and changes.  Treatment notes dated October 16, 2006, indicated that Plaintiff self-reported a history of bipolar disorder.  He reported that his symptoms were well-controlled with medication. Plaintiff left in a hurry because he needed to get back to work.  (Tr. 463)  On January 15, 2007, Plaintiff stormed into the office demanding a prescription refill.  (Tr. 461)  When he returned on March 12, 2007, he was not angry.  Plaintiff reported binge drinking again after 6 months of sobriety, with his last drink two weeks ago.  (Tr. 460)  On August 23, 2007, the examiner noted that the

---

[2]  A GAF of 21-30 indicates behavior that "is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home or friends).  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).

efficacy of Plaintiff's medications could be clouded by alcohol consumption. (Tr. 457) Plaintiff reported doing well on January 17, 2008, although he continued to drink alcohol. (Tr. 456)

Plaintiff was treated at the South County Health Center for depressive disorder; bipolar disorder, unspecified; chronic airway obstruction; pain in his joints; tobacco use disorder; and alcohol abuse in remission between January and August of 2007. (Tr. 290-301) On August 28, 2007, Plaintiff complained of pain in his joints and sought Vicoden. Musculoskeletal examination was normal and revealed full range of motion in all joints. (Tr. 290-91)

On May 29, 2008, Sherman Sklar, M.E., a licensed psychologist, examined Plaintiff at the request of the Department of Social Services. Plaintiff reported that he worked as a painting contractor for 14 years until he "hit the wall." Plaintiff was casually groomed and dressed but was very tense and frustrated during the interview. He indicated that he would rather be drinking. Dr. Sklar noted that Plaintiff was someone who did not continue outpatient psychiatric treatment, namely continuing medication. Plaintiff discontinued Effexor and Lamictal cold turkey even though he acknowledged that the medication was helpful. Mental status examination revealed a young man with a shaggy appearance that answered questions with as few words as possible. He was reactive, coherent, relevant, and logical. His cooperation was fair, and his affect was tinged with anger and depression. Dr. Sklar noted no signs of thought disturbance or history of delusions or hallucinations. However, suicidal ideation was still present. (Tr. 302-04)

Plaintiff reported that he lived alone in a house. He did not pay bills but cooked 2 meals a day. He was able to do household chores and grocery shop. He read but no longer enjoyed sports. Plaintiff stated he was just waiting to die. Dr. Sklar noted that Plaintiff was a loner who made no effort to reach out when depressed. Plaintiff was capable of caring for his personal needs but did a

minimal amount of self care when depressed. Dr. Sklar further noted that Plaintiff's concentration, persistence, and pace were very poor related to his deep depression. Dr. Sklar diagnosed alcohol dependence; polysubstance dependence; bipolar I disorder, most recent episode depressed, severe, without psychotic features; familial conflicts, and a GAF of 38.[3] (Tr. 304-05)

Lenora Brown, Ph.D., performed a psychological evaluation of Plaintiff on August 25, 2008. Plaintiff stated that his depressed mood was constant, but the medication helped. He reported that he last drank alcohol in February 2008. In addition, he claimed to be treatment compliant, with a medication regimen of Seroquel, Cymbalta, and Lamictal. Direct mental status examination revealed grooming and hygiene within normal limits. He was relaxed, coherent, relevant, and logical, and he generated some spontaneous conversation. His eye contact and cooperation were good. Plaintiff's mood was reported as depressed, and his affect was appropriate. He denied suicidal and homicidal ideation. Further, his insight and judgment were good. Plaintiff was able to perform activities of daily living, and he was able to get along with others and take care of personal needs. His concentration, persistence, and pace were fair. Dr. Brown assessed alcohol dependence; polysubstance dependence; problems related to the social environment, occupational and economic; and a GAF of 48.[4] She noted that Plaintiff's prognosis was fair and would likely improve with appropriate intervention, compliance, and sobriety. (Tr. 307-10)

---

[3] A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." DSM-IV-TR 34.

[4] A GAF of 41-50 demonstrates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR 34.

On September 4, 2008, Judith McGee, Ph.D., completed a Psychiatric Review Technique form. She noted that Plaintiff had bipolar I disorder and alcohol, polysubstance dependence. Plaintiff had mild restrictions of activities of daily living and moderate restrictions with regard to difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. Dr. McGee relied on examination notes from Dr. Sklar and Dr. Brown and concluded that Plaintiff's stated limitations were consistent with medical evidence and were fully credible. (Tr. 311-21) Dr. McGee also completed a Mental Residual Functional Capacity Assessment, finding Plaintiff moderately limited in the ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 322-24)

Eileen Wu, M.D., treated Plaintiff at BJC Behavioral Health from July 10, 2008 through October 26, 2010. (358-86, 480-92, 496-515) On July 14, 2008, Dr. Wu assessed major depressive disorder; rule out bipolar affective disorder I; alcohol and polysubstance dependence in acute remission; and a history of mood disorder. (Tr. 358-59) Although the initial hand written progress notes were somewhat illegible, Plaintiff saw Dr. Wu consistently on a monthly basis. On April 15, 2010, Dr. Wu noted that Plaintiff did not feel different on Prozac. He had trouble sleeping but did not like Trazodone or Wellbutrin. He was taking Hydrocodone. Dr. Wu planned to discontinue Prozac and Seroquel and continue Lithium and Effexor. (Tr. 480-82) Plaintiff called Dr. Wu's office on April 28, 2010 to request Seroquel. On May 12, 2010, he reported that he did not like Remeron and was still taking Hydrocodone. Dr. Wu increased the Lithium dosage, started Abilify, and

continued Seroquel and Effexor. He stated he was doing a little better on June 16, 2010. He had more motivation on Abilify but was slightly irritable at times. (Tr. 483-88)

Plaintiff reported on July 14, 2010 that he stopped taking Seroquel due to weight concerns and Tegretol because it did not work. When Dr. Wu explained that some medications needed gradual increases, Plaintiff became irritated and left the room. (Tr. 489-91) On July 21, 2010, Dr. Wu indicated that she sent an email to Plaintiff's case worker suggesting that Plaintiff transfer to a different psychiatrist due to poor therapeutic alliance. Plaintiff's mother phoned Dr. Wu on August 2, 2010 to report that Plaintiff was not taking his prescribed medication, eating, or answering the phone. Dr. Wu advised Plaintiff's mother to take him to the ER, but Plaintiff was unwilling to go because he did not want to miss his court date for disability benefits. On September 9, 2010, Plaintiff was still depressed. He reported no side effects from Risperdal but complained about experiencing anxiety when in public. Dr. Wu assessed bipolar affective disorder I, mixed episode; alcohol dependence in remission; remote history of polysubstance dependence; on narcotic medication; partial compliance, tendency of self-medicating; and a Cluster B personality disorder. She advised Plaintiff to continue Risperdal, add Lexapro, add Tegretol, and follow up in one month. (Tr. 505-08)

Dr. Jamry, Plaintiff's primary care physician, called Dr. Wu on September 15, 2010 to express concerns over Plaintiff's non-compliance. Plaintiff had requested Oxycodone. (Tr. 508) On October 11, 2010, Plaintiff reported doing better with a little more motivation with Lexapro. However, he had racing thoughts, especially in the evening before his night meds. He was frustrated with the disability process. Dr. Wu assessed bipolar affective disorder I, mixed episode; alcohol dependence in remission; remote history of polysubstance dependence; on narcotic medication; partial compliance,

tendency of self-medicating; and a Cluster B personality disorder.  She advised Plaintiff to continue Risperdal, Lexapro, and Tegretol, as well as change Cogentin and add Abilify.  (Tr. 509-11)

On October 26, 2010, Plaintiff reported being tired on the meds, as well as increased appetite and racing thoughts.  Dr. Wu noted that he had poor coping skills.  He was off all pain medications and reported being in a lot of physical pain.  Dr. Wu provided the same diagnosis.  She also increased Plaintiff's dosages of Lexapro and Tegretol, discontinued Risperdal and Abilify, and started Geodon.  On November 4, 2010, Dr. Wu discontinued Geodon and started Seroquel.  (Tr. 512-15)  GAF scores during Plaintiff's treatment ranged from 50 to 55.[5]  (Tr. 332, 353, 357)

Plaintiff was taken to the emergency room at St. Mary's Health Center via ambulance on March 14, 2009 complaining of palpations and a racing heart.  Plaintiff's stated reason for coming was depression.  Plaintiff was released with a prescription for Metoprolol and advised to see his doctor within 3 days.  (Tr. 431-46)

Dr. Wit Jamry treated Plaintiff on March 20, 2009 and May 28, 2010 for hypertension; pain in his back, knees, shoulders, and right elbow; depression; hyperlipidemia; and bronchitis.  On May 28, 2009, Dr. Jamry noted that Plaintiff was taking Hydrocodone for pain management.  (Tr. 391-95)

On March 27, 2009, Plaintiff presented to Forest Park Hospital.  Testing revealed mild kyphosis of the cervical spine; degenerative disc disease at C5-6 and C6-7; deformity versus resection of the proximal radial head on the right elbow; mild scoliosis of the lumbar spine with concavity to the left; and mild degenerative disc disease at L3-4.  (Tr. 449-55)

---

[5]  A GAF score of 51 to 60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning."  DSM-IV-TR) 34.

A Personalized Evaluation through BJC Behavioral Health completed on August 30, 2010 revealed diagnoses of other and unspecified alcohol dependence in remission; bipolar I disorder, most recent episode mixed, moderate; borderline personality disorder; hypertension, essential; back pains, poor coping skills, noncompliance; and a GAF of 50. Recommendations included continued medication services to reduce depression and anxiety; case management for education about mental illness and the importance of compliance with treatment; continued compliance; continued sobriety and attendance at support group; and individual therapy to learn skills to cope with mental illness. (Tr. 496-98)

On September 15, 2010, Plaintiff was seen at Grace Hill Neighborhood Health Services for complaints of hypertension and back pain. Plaintiff indicated that he quit taking pain medication 3 months ago. He was taking a maximum of 1-2 pain pills every 4 hours. He took 2-3 ibuprofen pills a couple of time per day with minimal help. Plaintiff reported that his last alcoholic drink was months prior. Miranda Coole, M.D., noted that Plaintiff's psychiatric symptoms had been stable for 2 years. He displayed no unusual activity or evidence of depression. Dr. Coole referred Plaintiff to orthopedics and recommended that Plaintiff continue over the counter medications and daily exercise. She prescribed Carbamazepine, Lexapro, Lisinopril, and Hydrocodone-acetaminophen. (Tr. 493-95)

On February 25, 2010, Dr. Wu completed a Mental Medical Source Statement indicating marked limitations in Plaintiff's ability to cope with normal stress; behave in an emotionally stable manner; relate to family, peers, or caregivers; accept instructions or respond to criticism; and respond to changes in a work setting. Dr. Wu opined that Plaintiff also had moderate limitations in areas of activities of daily living, social functioning, and concentration, persistence, or pace. She stated that Plaintiff could apply commonsense understanding to carry out simple one or two step intructions for

4 hours in a work day. In addition, he could interact appropriately with coworkers, supervisors, and the general public for zero to two hours. His psychologically based symptoms would cause him to miss work and be late to work three times a month or more. Further, Dr. Wu stated that Plaintiff's limitations lasted 12 continuous months at the assessed severity. She first saw Plaintiff in July of 2008, at which time he was pretty sick. Diagnoses included major depressive disorder, recurrent; rule out bipolar affective disorder I, mixed type; history of alcohol and polysubstance dependence, in remission; Cluster B personality disorder; multiple pains; and a GAF of 50-55. (Tr. 329-32)

On March 9, 2010, Dr. Jamry completed a Mental Medical Source Statement. He opined that Plaintiff had marked limitations in his ability to cope with normal stress; behave in an emotionally stable manner; maintain reliability; relate to family, peers, or caregivers; ask simple questions or request assistance; maintain socially acceptable behavior; and make simple and rational decisions. His limitations were extreme in his ability to adhere to basic standards of neatness and cleanliness; interact with strangers or the general public; accept instructions or respond to criticism; maintain attention and concentration for extended periods; perform at a consistent pace without an unreasonable number and length of breaks; sustain an ordinary routine without special supervision; and respond to changes in a work setting. Plaintiff could accomplish sustained and regular performance during an 8-hour workday for only zero to two hours. Dr. Jamry opined that Plaintiff was unable to work due to psychologically based symptoms. Dr. Jamry further stated that Plaintiff's limitations lasted or were expected to last 12 continuous months; however, Plaintiff's onset date was May 4, 2009, which was his first visit with Dr. Jamry. (Tr. 333-36)

Dr. Wu submitted an additional Mental Medical Source Statement dated April 18, 2011 to the Appeals Council. Dr. Wu opined that Plaintiff had marked limitations in his ability to cope with

normal stress; maintain reliability; relate to family, peers, or caregivers; interact with strangers or the general public; perform at a consistent pace without an unreasonable number and length of breaks; and respond to changes in a work setting. His limitations were extreme in his ability to behave in an emotionally stable manner and accept instructions or respond to criticism. While he could apply commonsense understanding to carry out simple one or two step instructions for 4 hours in an 8 hour workday, he could only interact appropriately with coworkers, supervisors, and the public for zero to two hours. Dr. WU diagnosed bipolar affective disorder, mixed type; alcohol dependence, in remission; remote history of polysubstance dependence; and Cluster B personality disorder. (Tr. 516-19)

### IV.  The ALJ's Determination

In a decision dated March 21, 2011, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since January 14, 2008, the application date. He had the following severe impairments: alcohol/drug dependence and bipolar disorder/major depressive disorder. His hypertension and degenerative disc disease were not severe. In making this determination, the ALJ relied on psychiatric treatment records and the treatment records from Dr. Jamry. The ALJ further found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-17)

After carefully considering the entire record, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform medium work except that he was limited to understanding, remembering, and carrying out no more than simple instructions and detailed tasks and performing repetitive work according to set procedures, sequence, or pace. He was able to take appropriate

16

precautions to avoid hazards. The ALJ considered Plaintiff's testimony, which included only hypertension as a physical impairment. The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms but that his statements concerning the intensity, persistence, and limiting effects were not entirely credible. The ALJ noted that in 2008, Plaintiff's primary problems were alcohol and drug dependence. He had a history of noncomplaince with medication and had used alcohol with in the past year. The ALJ found that Plaintiff's drug and alcohol use could not be separated from other mental disorders. Further, these mental disorders did not prevent Plaintiff from engaging in work related activities. (Tr. 17-19)

The ALJ also considered the opinion evidence from Dr. Wu and Dr. Jamry. With regard to Dr. Wu, the ALJ found that the treatment notes did not support the restrictions set forth in the medical source statement, entitling the opinion to less weight. The ALJ afforded very little weight to Dr. Jamry's opinion because it was based on only one appointment and because Dr. Jamry was an internist, not a psychiatrist or mental health professional. (Tr. 19-20)

The ALJ found that Plaintiff was limited to unskilled work due to an alleged mental impairment of alcohol abuse and substance dependence disorder, noting his history of alcohol, cigarette, marijuana, and cocaine use. The ALJ also noted Plaintiff's history in detox/rehab and arrests for DWIs and assault. Further, Plaintiff had only been compliant with psychotropic medications for the six weeks preceding the hearing. In addition, Plaintiff was able to care for himself, participate in leisure activities, and do repair work at his sister's home. He appeared tan and healthy looking. When Plaintiff was compliant with medications and refrained from drugs and alcohol, he was capable of working and was not disabled. Thus, the ALJ determined that Plaintiff was unable to perform his past work but could perform jobs that existed in significant numbers in the

national economy. Such jobs, according to the VE, included steam cleaner; laborer, boot and shoe; and saw operator. The VE's testimony was consistent with the Dictionary of Occupational Titles ("DOT"). Therefore, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, since Plaintiff's application date of January 14, 2008. (Tr. 20-22)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838

(8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's

complaints under the Polaski[6] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI.  Discussion

Plaintiff raises three arguments in his Brief in Support of the Complaint. First, he argues that the ALJ failed to properly evaluate the medical opinions in the record. Second, Plaintiff asserts that the ALJ failed to properly evaluate the medical evidence in the record. Finally, Plaintiff contends that substantial evidence does not support the ALJ's RFC determination. Defendant, on the other hand, argues that the ALJ properly evaluated the medical opinion evidence. In addition, the Defendant contends that substantial evidence supports the ALJ's credibility evaluation including the analysis regarding Plaintiff's non-compliance with treatment. Defendant also asserts that the RFC determination was supported by substantial evidence. The undersigned finds that substantial evidence supports the ALJ's disability determination in this case such that the decision of the Commissioner denying benefits should be affirmed.

## A.  Evaluation of Medical Opinion Evidence

Plaintiff first argues that the ALJ did not properly evaluate Dr. Wu's opinion or the other medical opinion evidence in the record. With regard to Dr. Wu, "[a] treating physician's opinion

---

[6]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); see also SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). The ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment. Goetz v. Barnhart, 182 F. App'x 625, 626 (8th Cir. 2006). Further, "[i]t is appropriate to give little weight to statements of opinion by a treating physician that consist of nothing more than vague, conclusory statements." Swarnes v. Astrue, Civ. No. 08-5025-KES, 2009 WL 454930, at *11 (D.S.D. Feb. 23, 2009) (citation omitted).

Here, Plaintiff saw Dr. Wu between July 2008 and October 2010. The ALJ acknowledged this relationship and thoroughly set forth Plaintiff's treatment history with Dr. Wu. (Tr. 14-15) However, despite Dr. Wu's opinions in her medical source statement of marked and extreme limitations, treatment notes indicated noncompliance with prescription medication regimen and with medical advice. (Tr. 489-91, 505-15) When Plaintiff was compliant with medications, he reported having more motivation and sleeping better. (Tr. 486, 509) Despite Dr. Wu's opinion that Plaintiff had limitations that would prevent him from working, the treatment notes did not reflect symptoms of such severity that would preclude him from performing any work. Indeed, the notes indicated fair grooming, cooperative behavior, okay mood, sustained attention, normal perceptions, normal speech, appropriate tone, normal psychomotor activity, and fair judgment and insight. (Tr. 480-88, 505-15) None of Dr. Wu's notes reflected the marked or extreme limitations set forth in her opinions. The

ALJ thoroughly evaluated Dr. Wu's opinion but correctly found that the opinion was entitled to little weight because it was inconsistent with her treating records and the other medical records.[7] (Tr. 14-15, 18-19)

As previously stated, the ALJ is not obligated to give controlling weight to a treating physician's opinion where that opinion is inconsistent with treatment notes and other medical evidence, and where the opinion is not supported by medically accepted clinical and laboratory data. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000) (citations omitted) (noting the Eighth Circuit has upheld an ALJ's decision to discount or disregard a treating physician's opinion where other medical assessments are supported by more thorough evidence or where the treating physician renders inconsistent opinions undermining the credibility of those opinions). In addition, "[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007). Although Plaintiff argues that the ALJ did not analyze the inconsistencies, the undersigned disagrees. The thorough discussion and analysis of Plaintiff's testimony, reports, and treatment records demonstrates the inconsistencies between Dr. Wu's medical source statement and the record as a whole. Therefore, the undersigned finds that the ALJ properly gave little weight to Dr. Wu's medical source statement of stating that Plaintiff was unable to work.

---

[7] The Court has also reviewed and considered the most recent medical source statement from Dr. Wu. (Tr. 516-19) Although it reaches the same conclusions, and lists even more marked/extreme limitations, the opinion is still inconsistent with treatment notes set forth by the ALJ and in the above discussion.

Plaintiff also argues, however, that the ALJ erred in failing to evaluate the opinion of the non-examining state agency psychologist and the opinion of Dr. Jamry. "Because nonexamining sources have no examining or treating relationship with [claimant], the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(c)(3). Further, under the regulations, "when evaluating a nonexamining source's opinion, the ALJ 'evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources.'" Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(3)). The record shows that the ALJ did consider the examination notes from Dr. Sklar and Dr. Brown, which were also the notes that the non-examining consulting psychologist relied upon to complete the Psychiatric Review Technique form and the Mental Residual Functional Capacity Assessment. Further, the undersigned finds significant the fact that the state agency psychologist completed these forms in 2008, before Plaintiff began treatment with Dr. Wu and Dr. Jamry. Thus, the non-examining consultant did not have the opportunity to review the treatment notes documenting Plaintiff's mental status exams and repeated noncompliance. See Wildman v. Astrue, 596 F.3d at 967-68 (8th Cir. 2010) (finding significant that agency evaluators did not have access to records from the relevant time period which showed the plaintiff's noncompliance and mental status exams).

In addition, the Court finds that the outcome would have remained the same if the ALJ had given more weight to this opinion. Id. at 968. Dr. McGee noted only moderate or no limitations in her Mental Residual Functional Capacity Assessment. (Tr. 322-24) Additionally, based on the medical evidence from January 2008 through September 2008, she found Plaintiff only mildly limited in activities of daily living and moderately limited in social functioning and concentration, persistence,

and pace. (Tr. 321) Thus, the undersigned finds that the ALJ did not err in disregarding the state agency opinion. Id.

With regard to Dr. Jamry, the record shows that the ALJ did consider the opinion but gave it very little weight because Dr. Jamry had examined Plaintiff only once and because Dr. Jamry was not a mental health professional. "Generally, the longer a treating source has treated [claimant] and the more times [claimant] has been seen by a treating source, the more weight we will give to the source's medical opinion." 20 C.F.R. § 404.1527(c)(2)(i). In addition, the ALJ gives more weight to a specialists opinion about medical issues related to the specific specialty area than to a non-specialist's opinion. 20 C.F.R. § 404.1527(c)(5). Here, Dr. Jamry had seen Plaintiff on one occasion before rendering his opinion, and he provided an opinion that was outside his area of practice. Further, the treatment notes indicate that Dr. Jamry merely checked boxes for anxiety and depression. (Tr. 392, 394) Nothing in his treatment notes supports the extreme limitations given in his medical source statement. Thus, the ALJ appropriately gave Dr. Jamry's opinion little weight. See Goetz v. Barnhart, 182 F. App'x 625, 626 (8th Cir. 2006) (finding that the ALJ need not give controlling weight to a treating physician's opinion where the physician's treatment notes were inconsistent with the physician's RFC assessment). In short, the Court finds that the ALJ properly considered and gave appropriate weight to the medical opinions provided in the record.

## B.  Evaluation of the Medical Evidence

Next, the Plaintiff contends that the ALJ improperly evaluated the medical evidence in the record. The undersigned disagrees. Plaintiff argues that his mental illness prevents him from complying with medication such that the ALJ could not rely on noncompliance as a reason for discrediting Plaintiff's allegations of disabling symptoms. In support, Plaintiff relies on Pate-Fires v.

Astrue, 564 F.3d 935 (8th Cir. 2009).  In Pate-Fires, the plaintiff was diagnosed with schizoaffective disorder which caused her to exhibit manic behavior, homicidal threats, paranoid delusions, significantly impaired insight, and complete denial of the illness.  Id. at 946.  The court found that the evidence overwhelmingly showed that the plaintiff's noncompliance was attributable to her mental illness.  Id.  Therefore, the court reversed the ALJ's denial of benefits, finding that the ALJ failed to recognize that noncompliance was a manifestation of the plaintiff's schizoaffective disorder and that noncompliance was common among persons with such disorders.  Id.

In the present case, however, the treatment notes consistently show that Plaintiff had no suicidal or homicidal thoughts and no delusions.  (Tr. 484, 487, 490)  He had no involuntary hospitalizations for mental illness, and specifically refused to go to the hospital because he did not want to miss his disability hearing.  (Tr. 492)  Further, "there is little or no evidence expressly linking [Plaintiff's] mental limitations to such repeated noncompliance."  Wildman, 596 F.3d at 966.  Indeed, most of Plaintiff's anxiousness and frustration stemmed from his disability application.  (Tr. 480. 483, 486, 509)  The record also shows that Plaintiff stopped taking medications because they caused weight gain and because he thought they weren't working.  (Tr. 18)  Plaintiff also continued to drink alcohol and seek narcotic pain medications.  Based on the above, the ALJ properly considered Plaintiff's failure to comply with medical treatment as a factor in determining Plaintiff's credibility and in assessing the medical evidence.  See Wildman, 959 F.3d at 966 (finding the ALJ did not err in discounting doctor's opinion because it was conclusory and failed to account for the plaintiff's noncompliance); Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (ALJ may use evidence of noncompliance to weigh the plaintiff's credibility).

Plaintiff also argues that the ALJ failed to properly consider Plaintiff's GAF scores. However, the record shows that the ALJ did consider the scores Plaintiff received early in his treatment. (Tr. 14) The scores, however, improved to 55, which indicated moderate symptoms. Further, "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy." Howard v. Commissioner of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002). "Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." Id.

Plaintiff further asserts that the ALJ failed to consider his chronic mental illness . The ALJ's decision belies this argument, as the ALJ thoroughly assessed Plaintiff's mental treatment history on a longitudinal basis in reaching the determination. (Tr. 14-17, 18-20)

## C.  The RFC Determination

Last, the Plaintiff argues that substantial evidence does not support the ALJ's RFC finding. Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Tinervia v. Astrue, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted).

Here, the Defendant correctly notes that the ALJ did support the RFC determination with medical evidence and other evidence in the record. The ALJ considered Plaintiff's testimony and discussed Plaintiff's lack of credibility in light of his daily activities, fit appearance, noncompliance with medical treatment, continued drinking, and high level of functioning when in compliance. (Tr. 16, 20) Further, the ALJ considered all of the medical evidence in the record and included those limitations that were credible. (Tr. 17-20) The Court finds that the ALJ did not err in assessing Plaintiff's RFC. "The ALJ thoroughly discussed the medical records before outlining [her] RFC determination, which [this Court] conclude[s] is supported by substantial evidence. Gaston v. Astrue, 276 F. App'x 536, 537 (8th Cir. 2008). In addition, while the ALJ could, perhaps, have written a better opinion, arguably deficient opinion-writing does not require the court to set aside an ALJ's decision when the deficiency has no bearing on the outcome. Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008). Therefore, substantial evidence supports the ALJ's determination, and the decision of the Commissioner is affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this  20th  day of March, 2013.